UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | DOCKET NO. 1:16CR26 |
| | APRIL 12, 2018 |
| VS. | |
| | 10:51 A.M. |
| CHRISTOPHER CRAMER AND RICKY FACKRELL | BEAUMONT, TEXAS |

---

VOLUME 1 OF 1, PAGES 1 THROUGH 26

REPORTER'S TRANSCRIPT OF EXCERPT OF
VOIR DIRE EXAMINATION OF PROSPECTIVE JUROR 66

BEFORE THE HONORABLE MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

FOR THE GOVERNMENT: JOSEPH BATTE
JOHN CRAFT
U.S. ATTORNEY'S OFFICE
350 MAGNOLIA
SUITE 150
BEAUMONT, TEXAS 77701

SONIA JIMENEZ
DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
1331 F. STREET NW, 6TH FLOOR
WASHINGTON, DC 20530

FOR CHRIS CRAMER: DOUGLAS BARLOW
ATTORNEY AT LAW
707 TEXAS AVENUE S
SUITE 216D
COLLEGE STATION, TEXAS 77840

DEFENDANT'S
EXHIBIT
1
1:16CR26

GEORGE PATRICK BLACK
FEDERAL PUBLIC DEFENDER
110 NORTH COLLEGE
SUITE 1122
TYLER, TEXAS 75702

FOR RICKY FACKRELL: GERALD BOURQUE
ROBERT MORROW
ATTORNEYS AT LAW
24 WATERWAY AVENUE
SUITE 660
THE WOODLANDS, TEXAS 77380

COURT REPORTER: TONYA B. JACKSON, RPR-CRR
FEDERAL OFFICIAL REPORTER
300 WILLOW, SUITE 239
BEAUMONT, TEXAS 77701

PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE; TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

TABLE OF CONTENTS

PAGE

VOIR DIRE EXAMINATION BY MR. BARLOW 4

VOIR DIRE EXAMINATION BY MR. MORROW 14

VOIR DIRE EXAMINATION BY MR. CRAFT 21

COURT REPORTER'S CERTIFICATION 26

[OPEN COURT, DEFENDANTS PRESENT.]

(Prospective Juror 66 enters the courtroom. )

(Oath administered.)

THE COURT: All right, Ms. Stanley. After answering your questions last week, are there any answers that you would want to change that you can think of at this time?

PROSPECTIVE JUROR: No, ma'am.

THE COURT: Very well. I'll hand it over to the lawyers.

VOIR DIRE EXAMINATION OF PROSPECTIVE JUROR 66

BY MR. BARLOW:

Q. Good morning, Ms. Stanley.

A. Morning.

Q. Hi. I'm Doug Barlow; and along with Mr. Black, we represent Mr. Cramer. We want to visit with you about some of your answers here and some general principles. Okay?

Let's start out with Question No. 38. You answered that and told us that your husband was an MP in the military?

A. Yes, sir.

Q. Okay. How long did he serve as an MP?

A. That part, I'm not sure. We just -- we met after he retired from the military.

Q. Okay.
A. And just recently got married. We have been married about three years.
Q. Okay.
10:52AM A. So, the particulars on the amount of time that he served as that duty, I'm not sure.
Q. Okay. Well, in cases like this, criminal cases, a lot of times there are law enforcement people who testify. Just by virtue of you knowing about your 10:52AM husband's service as a police officer, you wouldn't give any added credibility to someone who testified just because they're a police officer, would you?
A. I don't feel that I would, no.
Q. Okay. Some people believe that they're more 10:52AM believable just because they're a peace officer.
A. Well --
Q. Any problem -- tell me how you feel about that.
A. I feel that they should be.
Q. They should be. That's true.
10:53AM A. Yes.
Q. But the law says that you have to judge each witness on an even plane and decide whether they're telling the truth or they're not telling the truth and it wouldn't be fair for a witness to come in and 10:53AM automatically have some added credibility --

A. True.
Q. -- when you haven't even heard the evidence.
A. Sure. Yes.
Q. You agree with that?
10:53AM A. Yes, sir.
Q. And Question No. 47 on page 9, you mentioned that you think the effectiveness of the criminal justice system has been hampered by social media. Can you tell me a little more about that?
10:53AM A. Well, I'm a schoolteacher; and I've watched the children's attitudes change toward our criminal justice system, more or less. They think -- a lot of them think that the police are the bad guys, and that's how I -- I think a lot of that has to do with social media and the 10:54AM things they see and hear on social media.
Q. Okay. Anything about that that would affect your jury service, though?
A. No, sir.
Q. Okay. Question No. 61, you told us about your 10:54AM prior jury service; and that kind of bothered you apparently, your service, about how that went down?
A. A little bit, yes, sir.
Q. Tell me a little bit about that.
A. Well, they picked a jury and they just walked 10:54AM us -- from what I remember, they just walked us by this

lady that was sitting in confinement and she was in a straight jacket and then sent us into a room to decide whether or not she was competent and that seemed to be -- I mean, it was hard to me to decide if someone is competent when you see them in that state.

10:54AM

Q. How long ago was that?

A. It's been years ago. I couldn't even tell you how long ago it was.

Q. And where was that?

10:55AM

A. In Jefferson, here.

Q. Okay. Well, long ago you had to have a jury to determine competence; and it may have been an agreed thing.

A. It seemed like it was already done.

10:55AM

Q. And now they can waive a jury and have the judge make that determination, but it was just the way the system used to work. They had -- they may have a jury to do it and even though all sides agreed.

A. Okay.

10:55AM

Q. So, that may have been why that happened.

A. Okay.

Q. Let's talk about the death penalty issues a little bit, starting out with Question 73.

You told us a lot in 72 about how you feel about the death penalty, but you indicated in 73 that you

10:55AM

don't have any opinion at all about -- either for or against the death penalty. Okay?

A. Well, I read the other ones. Like A said it would make it difficult for me as a juror to reach a verdict of guilty or not guilty, and I didn't feel that that was -- my opinion would make it difficult.

And then -- it was just a matter of elimination as I read them.

Q. Okay. The next question, 74, you indicated the very top that said you feel strongly that it is important that we have the death penalty as punishment.

A. Well, I think we need a penalty as strong as the death penalty.

Q. Okay.

A. I feel it should fit the crime sometimes.

Q. Okay. Tell me a little bit more about your feelings about the death penalty, why we ought to have it and what purpose you think it serves.

A. Well, I think when someone commits a crime that they're found guilty of, sometimes it -- the penalty should be the death penalty.

Q. Okay.

A. And I don't know -- I really -- before this I had never really given it a whole lot of thought.

Q. Okay. Some people believe that -- kind of the old

"eye for an eye" theory, that if you take a life, you should forfeit your life; and other people believe the death penalty is something we really ought to use just as a last resort if there's nothing else we can do about an individual that's been convicted of capital murder.

10:57AM

Do you see how there's those different extremes?

A. Yes. I wouldn't say I'm really an "eye for an eye" because there are circumstances for murder -- you know, there are times when I guess you would say that's justifiable, you know, if you --

10:57AM

Q. Well, if it's justifiable -- you have to get past that hurdle. If it's justifiable or it's legally excused, it's not a crime at all.

10:58AM

A. Okay.

Q. So, it's only those cases where somebody has been convicted of that premeditated capital murder that you ever face those issues.

A. Okay.

10:58AM

Q. And if you sat on the jury, you would have to listen to enough facts before you could ever get to that stage; and you would have found a person guilty of that premeditated capital murder.

A. Okay.

10:58AM

Q. You would then have to go through that second

phase where someone has been proven to be eligible for the death penalty with one of those aggravating circumstances, and you've already crossed that hurdle.

Then you get to the last stage that we've talked about this morning, and that's the stage where the government is required to put on aggravating circumstances. That's something that's bad, as they say, that would cause a person to lean towards the death penalty. And some folks believe, well, if they get to that stage, then it's over. That's enough for the death penalty right there. The law says that you still have to have an open mind about whether the sentence should be death or life.

Do you think if you went through those three stages, you would have your mind made up or would you still be open to a life or death sentence?

A. I think I could stay open-minded.

Q. Okay. And the law also says at that point you have to weigh those aggravating circumstances even if there's no mitigating things presented to you and decide whether a death penalty is sufficient or not. Do you think you could keep your mind open?

A. I think I could. I think it would be a hard decision to make.

Q. Okay. Well, it's supposed to be.

A. Yes.

Q. The defense then has the right to put on mitigating evidence. Do you understand what that is?

A. Yes, sir.

10:59AM Q. Okay. Is there anything that comes to mind to you of what would be mitigating in a case like this?

A. Well, from the slideshow earlier, it said, you know, the childhood circumstances.

Q. Okay. And there's no end to the list of what people come up with. They talk about the environment --

10:59AM

A. Right.

Q. -- somebody that's grown up in child abuse, social problems somebody may have. It's just anything. And some people don't believe any of that is important, and they don't want to listen to it at all. But I gather that's something that you would think would be important for consideration?

11:00AM

A. I think so. I feel that they -- you know, I just relate everything to teaching, that, you know, it makes a difference how a child behaves in my classroom depending on what happened before he got there, you know, the home circumstances. It doesn't always excuse a disruptive or a bad behavior, but it's kind of that I guess you would say mitigating. Would that be something like that?

11:00AM

11:00AM Q. Yeah. That's a very good example. Something that

explains the behavior.

A. Okay.

Q. And it's not an excuse for the offense, but it tells you why these things are happening.

11:00AM A. Okay.

Q. I know exactly what you're talking about. My wife just retired from teaching. So, I heard that an awful lot.

You indicated also that you know a little bit

11:00AM about gangs in prison?

A. I did?

Q. Well, that's Question 90. It's just a "yes" or "no" question. So, it doesn't really go into depth.

A. Oh, have you ever heard of gangs? But only like

11:01AM from the movies.

Q. Okay.

A. Yeah. It's not a --

Q. Have you formed any kind of opinions about how gangs operate or anything like that?

11:01AM A. Not really, no. I've wondered how they do that kind of thing once they're in prison, but I guess they do still socialize so...

Q. Okay. Do you know anything about prison life at all?

11:01AM A. No, sir, not really.

Q. Know anybody that's been inside a prison?
A. None other than a preacher, you know, going in and...
Q. A preacher going in?
11:01AM A. Well, going in and preaching, you know.
Q. Right. Do you have any personal experience in that?
A. No, sir.
Q. Do you think that might be a different world that
11:01AM perhaps most of the general public doesn't know anything about?
A. I would think so.
Q. Okay. Do you have any questions of me, ma'am?
A. Yes.
11:02AM Q. Okay.
A. And I don't know -- I'm just going to ask you. If you're defending someone and you know they're guilty, are you, by law, still required to defend them; or can you -- I mean, would you still defend them if you knew they were
11:02AM guilty?
Q. Well, those are personal questions that I probably wouldn't answer; but I can tell you under --
A. Okay.
Q. -- the law, everyone is presumed to be innocent
11:02AM and everybody is entitled to counsel, whether they were

guilty -- not talking about this case. Whether they're guilty or not guilty, everyone is not guilty unless the prosecution, either the state or the government, can prove them guilty beyond a reasonable doubt.

11:02AM A. Right.

Q. And our Constitution entitles somebody to a defense. They're not entitled to put on false things, but they're entitled to have their constitutional rights protected.

11:03AM A. Okay.

Q. So, does that help you out a little bit?

A. Yes, sir.

Q. Okay. Thank you.

VOIR DIRE EXAMINATION OF PROSPECTIVE JUROR 66

11:03AM BY MR. MORROW:

Q. Good morning, Ms. Stanley.

A. Good morning.

Q. Judge told you my name is Robert Morrow, and Gerald Bourque and I represent Ricky Fackrell.

11:03AM When you first got up there, I thought, oh, gosh, she talks so softly and she's not going to want to say very much; but you really got going there pretty good. Normally we don't get to answer juror's questions like that. I'm going to get back to that question of

11:03AM yours. But the example you gave about mitigation about

children in your classroom, that was very insightful; and I want to kind of talk about that for a little bit. Okay?

You and Mr. Barlow talked about mitigation which might help explain behavior, and your example was from your classroom. Something bad happened -- no breakfast, parents fighting -- that might affect how a child behaves. You've seen that, haven't you?

A. Yes, sir.

Q. What's the worst example of that you've seen in your experience?

How long you been a teacher?

A. 19 years. I taught adaptive behavior for 3 years, elementary; and I saw a lot of that from -- because the children's home lives were from emotionally disturbed, abuse, and all that kind of stuff. And probably the worst scenario was just over the holidays, starting all over with a child after being home in that environment. I don't have any real specific situation, but it happened all the time.

Q. The more you had them with you, you had a better chance to accomplish something and teach them something?

A. Yes, sir.

Q. And then when they were away a long time, you had to start over basically.

A. (Moving head up and down).

Q. Well, that is very interesting. I appreciate your work. We know that you don't get paid nearly enough for all you put into it. So, thank you.

11:04AM I want to talk about a different kind of concept of mitigation like that. You may get mitigation that explains somebody's conduct, but you also may get mitigation that just gives you more information about somebody, how they maybe came to be to where you're 11:05AM looking at them in court. That doesn't necessarily explain the conduct but gives you fuller information about who they are to help you decide an appropriate punishment.

Does that seem like a good concept?

11:05AM A. Yes.

Q. Would you embrace that part as well?

A. I think I could. I think so.

Q. Would that be just as meaningful to you as the other type of mitigation which might directly explain why 11:05AM somebody behaved a certain way?

A. I would have to consider it, for sure, yes.

Q. And you would be willing to do that?

A. Yes, sir.

Q. Okay. Another aspect of our case, we have two 11:05AM defendants here at this table, big table, lots of

lawyers. But as I think Mr. Bourque has stressed, our job is to represent Mr. Fackrell; and Mr. Barlow and Mr. Black represent Mr. Cramer. But you as jurors, you're going to hear all this information washing over you at one time; but when you go back to deliberate, you're going to be asked to separate that out and only consider what the government did or didn't prove about Mr. Fackrell or what information we offer and then separately what Mr. Cramer -- information you have about him.

Do you think you could do that?

A. I think I -- I would have to try.

Q. Maybe that math background is going to help you a little bit there?

A. Maybe, yeah.

Q. That's something that really concerns us because you're going to hear about a whole new environment, about prison and what life is like in there, and we just worry that it would be difficult for you to separate those two things and, so, we want to keep reminding you that at the end of this process, you know, you're going to be asked to make an individual judgment. Can you do that?

A. Yes, sir.

Q. Now, let's contrast this service with that -- I don't know what you want to call it -- sham of a trial

you were on before, you know, when you walked past the woman -- was it a woman?

A. Yes.

Q. So, that was not something we're going to make an excuse for. This is exactly the opposite of that. So, you're going to be given weeks and weeks of testimony and you're going to be asked then to go back and deliberate individually. Did y'all have much deliberation, much talk?

11:07AM

A. Not really, no.

11:07AM

Q. We need for you to be able to do that, to talk to the other jurors; but we also need for you to be able to vote your individual conscience about what you think the result should be. You sound like somebody that's going to insist on doing that.

11:07AM

A. Yes, I think I could -- I would.

Q. Okay. So, you would welcome an opportunity, I would think, to have the opposite of that last experience that you had; is that right?

A. Yes.

11:07AM

Q. Okay. Being a teacher for all these many years, you're used to making decisions and telling people how to do their work; but could you respect the other jurors' decisions if they were different from yours? Could you understand each of them has to make that same individual

11:07AM

choice?

A. Yes.

Q. Okay. The idea about this being a prison case, too, that's the last thing I want to touch on before I sit back down. This is not going to be something that you would have heard about before. I mean, you know, even a T.V. show or something about prison life. And we're worried that just that one aspect -- you know, this doesn't take place in a convenience store or a home or -- it's in prison. So, there's a whole different set of rules and life that you're going to learn about; and we have to make sure that you're open to that and you won't -- just by the fact that our client has been convicted of a crime and is charged with another one, you won't necessarily start him off so far behind that we're never going to catch up.

Is that something that you think you could do?

A. Yes, sir.

Q. Could you talk to me about that just a little bit?

A. Well, like you said, you have to pick up where they -- where you start with them. So, rather than have that preconceived notion that they're already a bad person and they've just added another thing to their rap sheet, so, you know, just convict them because of that, I don't think that would be fair.

Q. You've dealt with a lot. You've got a lot of information. You've seen a lot of kids. Do you think that you could just accept that information and -- and that's the environment you're going to have to make your decision in. This is a prison case, and that's -- we just want to make sure that you can be fair to us with that being the starting point. Can you?

A. I think I could, yes, sir.

Q. And the last thing I just want to kind of answer your question just a little bit. Mr. Barlow I think did a really good job of that. But, you know, for us as lawyers, we really do honor the rules; and the presumption of innocence is very important to us. I think what you're going to find in most cases is, you know, it's not so much a question of us making a decision. It's trying to bring both sides of a fact situation to you. Certain things happened. The events themselves may not be in dispute. It's how you should interpret those events. It's a perspective that's important. You can imagine our clients might have a different perspective than other people that were involved in the same events. Do you see what I'm saying?

A. Yes, sir.

Q. So, we take it as a high honor to be able to come in here and represent someone with their life on the line

and have a chance to tell you what it is that we think is important about the facts and ask you to consider them from our perspective; and that's what we do. And the government does the same thing from their perspective. Does that make sense?

11:10AM

A. Yes, sir.

Q. Thank you so much. I appreciate your time.

A. Thank you.

VOIR DIRE EXAMINATION OF PROSPECTIVE JUROR 66

11:10AM BY MR. CRAFT:

Q. Hello, Ms. Stanley.

A. Hi.

Q. I hope you remember my name is John Craft. I'm one of the three prosecutors in the case.

11:10AM A. Yes, sir.

Q. You getting combat pay for 7th grade math teacher?

A. No, sir.

Q. I think I can relate at least a little. A million years ago in the late Cretaceous while I was going through graduate school the first time, I substitute taught in middle school. I was selected often not for my necessary intellect but based on my size. I kept the school from being burnt down during the day, and I was popular with the principal.

11:11AM

11:11AM A. I wouldn't want to be a substitute.

Q. Right. And I thought it was interesting that you said that you -- and quite naturally so -- look at the world from your perspective and lengthy perspective as a teacher.

11:11AM A. Yes, sir.

Q. So, I wanted to ask you about that a little bit. I think that's probably a very even-handed way to look at the world.

I would imagine in your classroom there are

11:11AM probably super spellers, for lack of a better word. I mean, they always got their hands in the air; and they're right up front?

A. Yes.

Q. And then there are probably more diffident

11:11AM students. I used to call them "C minus ghetto." They sit in the back, and they're probably not your favorites. And lucky for me you weren't my 7th grade math teacher because I hated math and there's a rumor going around that I might have been fractious in middle school, but

11:12AM that's just a patent falsehood.

So, let me ask you this question: If one of your C minus ghetto dwellers came in and didn't have his assignment and said, "Dog ate my homework," you might meet that with some skepticism, right?

11:12AM A. Right.

Q. How about if there were other facts that supported that? Maybe you had a YouTube video of Fido actually eating his homework. Maybe that would change your perhaps negative expectation of that person?

11:12AM A. Yes.

Q. Well, I wanted to set that as a context for you because you've heard that there may be some cooperating inmate testimony in this case; and there has been a suggestion that, well, just can't believe those people 11:12AM and names have been called. And in fact, the judge is going to give you an instruction if you're on the jury -- and I'll read it to you -- that you should never convict -- and this is with regards to accomplice or informer testimony -- that you, as a juror, should never 11:12AM convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

So, my question is: Would you be open, as you were in the case of your C minus ghetto dweller who had 11:13AM something that you weren't necessarily going to be receptive to because you've had some experience with him, going to be open to looking at other facts that might tend to support that objectively; or would you just throw out the baby with the bath water and say, "Well, I don't 11:13AM like inmate testimony" or "I don't like my C minus ghetto

fellow and, so, I'm just not going to listen to what else he has to say"?

A. No. I'd have to consider it.

Q. So, you'd keep an open mind?

11:13AM A. Yes, sir.

Q. All right. I wanted to ask you about your answers to questions 99 A and B.

And that was your definition of premeditation. And, of course, you completed those answers before you

11:14AM had the benefit of the instruction that you got from the attorneys this morning about legally what constitutes premeditation.

In fact, you said (reading) I think premeditation would be accompanied by motive, not just a

11:14AM reaction to immediate situation.

And then you went down in substantial premeditation, you talked about (reading) substantial period of time, plenty of evidence to support that.

Do you understand that those things could

11:14AM happen, premeditation and substantial premeditation, based on the facts, in a very short period of time?

A. Yes.

Q. And you should further understand that of course words are expected to have their plain meaning and you'll

11:14AM get instruction on premeditation, but you may have to

make the judgment call based on the facts that you've heard, if you're selected as a juror, what constitutes substantial and also what constitutes insubstantial. So, you'll have to make that judgment.

11:14AM I'll give you an example to see if you see what I'm talking about here. Let's imagine back when you were 18 and dating, your mom said, "Be home at 11:00 o'clock sharp." I don't know if that ever happened, but let's just imagine. 11:00 o'clock. 11:00 o'clock comes

11:15AM and goes. You're not home. You're in the doghouse. But you walk in the door one minute later. Was that a substantial or insubstantial deviation from Mom's rules?

A. Insubstantial I think.

Q. Okay. What if you got to be 30 or 40 minutes

11:15AM late? Might be bouncing toward the --

A. Substantial.

Q. You see what I'm saying?

A. Yes, sir.

Q. It's a judgment call based on the person making

11:15AM that judgment, and you might be that person if you're selected for the jury. And you'd make that decision based on the facts and the events that required you to make that decision; is that correct?

A. Yes, sir.

11:15AM Q. Thank you.

MR. CRAFT: No further questions of this witness.

THE COURT: Counsel, are there any questions for the court?

11:15AM MR. CRAFT: Not from the government, judge.

MR. MORROW: No, your Honor.

MR. BARLOW: No, your Honor.

THE COURT: All right. Ms. Stanley, we're finished with respect to this portion of the jury 11:16AM selection process and your name has been added to the list of potential jurors, but you may or may not be selected to serve on the jury. The court's clerk will be in touch with you with regard to your future obligations. So, you're excused temporarily; but you're not discharged 11:16AM from service.

PROSPECTIVE JUROR: Thank you.

THE COURT: Thank you.

(Prospective Juror 66 exits the courtroom.)

(END OF EXCERPT.)

**COURT REPORTER'S CERTIFICATION**

I HEREBY CERTIFY THAT ON THIS DATE, APRIL 24, 2018, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

/s/
TONYA JACKSON, RPR-CRR