FILED

U. S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

## JUN 1 1 2018

UNITED STATES DISTRICT COURT          EASTERN DISTRICT OF TEXAS

BY

DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 1:16-CR-26 |
| | § | |
| CHRISTOPHER CRAMER (1) | § | |

## COURT'S INSTRUCTIONS TO THE JURY—PHASE THREE

Members of the Jury:

Now that you have heard all of the evidence in this case, it is my duty to give you instructions as to the law applicable to the question of punishment selection. You have found the defendant, Christopher Cramer, guilty beyond a reasonable doubt of the first degree murder of Leo Johns, and you have also found the defendant, Christopher Cramer, eligible for the death penalty under the law. You must now consider whether justice requires imposition of the death penalty or life imprisonment without the possibility of release. This decision is left exclusively to the jury. I will not be able to change any decision you reach in this regard. You, and you alone, will decide whether the defendant should be sentenced to death or life imprisonment without the possibility of release. Thus, I again stress the importance of your giving careful and thorough consideration to all of the evidence before you.

### GENERAL INSTRUCTIONS

Some of the legal principles that you must apply at this stage of the proceedings duplicate those instructions I have already given you in the trial. I will now repeat several of the instructions I previously gave for guidance in your deliberations with respect to this the selection phase of the trial.

## DUTY TO FOLLOW INSTRUCTIONS

You, as jurors, are the judges of the facts. But in determining what actually happened—that is, in reaching your decision as to the facts—it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

## EVIDENCE TO CONSIDER

In making all of the determinations that you are required to make in this the selection phase of the trial, you may consider any evidence that was received by the court during the merits and eligibility phases of the trial and the additional evidence received during this phase. You may consider no other evidence. The law demands of you a just verdict, based solely on the evidence, your common sense, and the law as I give it to you. Although the lawyers will make arguments to summarize and interpret the evidence for purposes of this selection phase of the trial, the arguments of the lawyers are not evidence.

## BURDEN OF PROOF

The government has the burden of proving beyond a reasonable doubt the non-statutory aggravating factors alleged in the selection phase of the trial for consideration of a death sentence.

2

A reasonable doubt may arise from the evidence produced by either the government or the defendant during the selection phase, keeping in mind that the defendant never has the burden or duty of calling any witnesses or producing any evidence. It may also arise from the government's lack of evidence. As I explained to you previously in both the merits and eligibility phases, while this burden of proof is a strict or heavy burden, it is not necessary that proof of the non-statutory aggravating factors be beyond all possible doubt. It is only required that the proof by the government exclude any reasonable doubt as to the non-statutory aggravating factors to your unanimous satisfaction.

A "reasonable doubt" is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

As was true in the first two phases of the trial, the defendant at this phase does not have to present any evidence. The defendant does not have to prove to you that a non-statutory aggravating factor does not exist or that he should not be sentenced to death.

As I have previously told you, under our Constitution, a defendant has no obligation to testify or to present any other evidence. That is as true in this phase as it was in the merits and eligibility phases of the trial. Thus, no adverse inference may be drawn against a defendant who does not take the stand.

## EXCLUDING WHAT IS NOT EVIDENCE

As I told you earlier, it is your duty to determine the facts. In doing so, you must consider only the evidence presented during the trial, including the sworn testimony of the witnesses,

3

stipulations, and the exhibits.  Remember that any statements, objections, or arguments made by the lawyers are not evidence.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice.  In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.  What the lawyers say is not binding upon you.

During the trial I sustained objections to certain questions and exhibits.  You must disregard those questions and exhibits entirely.  Do not speculate as to what the witness would have said if permitted to answer the question or as to the contents of an exhibit.  Also, certain testimony or other evidence has been ordered stricken from the record and you have been instructed to disregard this evidence.  Do not consider any questions you have been told to disregard in reaching your decision.  Your verdict must be based solely on the legally admissible evidence and testimony.

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

### EVIDENCE—INFERENCES—DIRECT AND CIRCUMSTANTIAL

In considering the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

4

Do not be concerned about whether the evidence is "direct evidence" or "circumstantial evidence." You should consider and weigh all of the evidence that was presented to you.

"Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. "Circumstantial evidence" is proof of a chain of events and circumstances indicating that something is or is not a fact. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

## CREDIBILITY OF WITNESSES

I remind you that it is your job to decide whether the government has proved the existence of the non-statutory aggravating factors beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case. You should decide whether you believe all or any part of what each person had to say, and how important that testimony was. In making that decision I suggest that you ask yourself a few questions: Did the person impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the government or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he or she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's

5

testimony differ from the testimony of other witnesses? These are a few of the considerations that will help you determine the accuracy of what each witness said.

Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say. In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point. You will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

## IMPEACHMENT BY PRIOR INCONSISTENCIES

The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.

If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves.

6

## IMPEACHMENT BY PRIOR CONVICTION

You have been told that the following witnesses have prior felony convictions:  Travis Blodgett was convicted of ten counts of bank robbery, one count of using and carrying a firearm in a crime of violence, and one count of attempted escape in 2007 in the District of New Hampshire; Derek Capozzi was convicted of one count of felon in possession of a firearm and ammunition, one count of attempted extortion affecting commerce, and one count of use of a firearm during a crime of violence in 2000 in the District of Massachusetts, one count of conspiracy to commit witness tampering, one count of accessory after the fact to witness tampering killing, and one count of Hobbs Act Conspiracy (Robbery) in 2005 in the District of Massachusetts, and one count of escape in 2012 in the Eastern District of Kentucky; Otis Carden was convicted of one count of conspiracy to possess with intent to distribute methamphetamine and two counts of possession with intent to distribute methamphetamine in 2008 in the Middle District of Florida, and one count of dealing in stolen property, one count of owning and operating a chop shop, and one count of possession of a vehicle with removed Vehicle Identification Number in 2008 in Polk County, Florida; Andrew Creech was convicted of one count of conspiracy to commit murder for hire, one count of conspiracy to distribute cocaine base, one count of possession with intent to distribute cocaine powder, and one count of possession with intent to distribute marijuana in 1998 in Louisiana state court; Alexander Fetters was convicted of one count of conspiracy to possess with intent to distribute methamphetamine in 2010 in the District of Montana, one count of criminal endangerment in 2001 in Montana state court, and one count of felony theft in 1996 in Montana state court; Elizabeth Rose pleaded guilty to one count of conspiracy to possess with intent to distribute methamphetamine in 2018 in the Eastern District

of Texas and was convicted of one count of possession of methamphetamine in 2013 in Harris County, Texas; Jason Scoggan was convicted of one count of felon in possession of a firearm in 2010 in the District of Utah, two counts of unlawful acquisition or possession of a transfer card in 2009 in Ogden County, Utah, one count of endangerment of a child or elder adult in 2008 in Ogden County, Utah, and one count of forgery in 2000 in Ogden County, Utah; Jason Thompson was convicted of one count of bank robbery and one count of escape in 2007 in the Western District of Arkansas, and one count of robbery in 2002 in Texas state court; and Bradley Wasson was convicted of one count of a violent crime in aid of racketeering and one count of felon in possession of a firearm in 2009 in the District of New Mexico, one count of attempted aggravated battery with a deadly weapon in 1999 in New Mexico state court, and one count of larceny of a firearm, two counts of false imprisonment, and one count of forgery in 1998 in New Mexico state court. A conviction is a factor you may consider in deciding whether to believe that witness, but it does not necessarily destroy the witness's credibility. The convictions have been brought to your attention only because you may wish to consider them when you decide whether you believe the witness's testimony. They are not evidence of anything else.

## INFORMER TESTIMONY

The testimony of a witness who provides evidence against a defendant for a benefit, favored treatment, a potential reduction in sentence, placement in a special program, or for personal advantage must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the

witness has or may receive from providing testimony in this case. You should keep in mind that such testimony is always to be received with caution and weighed with great care.

You should never find the existence of an aggravating factor in the selection phase based upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

## EXPERT WITNESSES

During the trial, you heard the testimony of Gregg Mokrzycki, a forensic document examiner with the Federal Bureau of Investigation, who expressed opinions regarding handwriting analysis; Dr. John Ralston, Chief Forensic Pathologist with Forensic Medical of Texas, who expressed opinions regarding forensic pathology and the autopsy of Leo Johns; Dr. Dan Roberts, a clinical psychologist, who expressed opinions regarding social history and environmental factors pertaining to Christopher Cramer; Dr. Barbara Belbot, a prison culture expert, who expressed opinions regarding prison culture and gangs; Tim Gravette, a prison expert, who expressed opinions regarding Bureau of Prisons operations and the housing of Christopher Cramer; Dr. John Fabian, a neuropsychologist, who expressed opinions regarding his neuropsychological evaluation of Christopher Cramer; Dr. Matthew Mendel, a psychologist, who expressed opinions regarding social history and environmental factors pertaining to Ricky Fackrell; Dr. Robert Johnson, a prison culture expert, who expressed opinions regarding prison culture and gangs; Mark Bezy, a prison expert, who expressed opinions regarding Bureau of Prisons operations and the housing of Christopher Cramer and Ricky Fackrell; Dr. Jill Hayes, a neuropsychologist, who expressed opinions regarding social history and environmental factors pertaining to Christopher Cramer and Ricky Fackrell; David Berkebile, a prison expert, who expressed opinions regarding Bureau of

Prisons operations and the housing of Christopher Cramer and Ricky Fackrell; Dr. Shara Johnson, a Bureau of Prisons clinical psychologist, who expressed diagnostic opinions pertaining to Ricky Fackrell; and Dr. Krystle Brown, a Bureau of Prisons clinical psychologist, who expressed diagnostic opinions pertaining to Ricky Fackrell.

If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters. Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. You should judge such testimony like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case.

## STATEMENT—VOLUNTARINESS

In determining whether any statement, claimed to have been made by a defendant outside of court and after an alleged crime has been committed, was knowingly and voluntarily made, you should consider the evidence concerning such a statement with caution and great care, and should give such weight to the statement that you feel it deserves under all the circumstances.

You may consider in that regard such factors as the age, sex, training, education, occupation, and physical and mental condition of the defendant and all the other circumstances in evidence surrounding the making of the statement.

Of course, any such statement should not be considered in any way whatsoever as evidence with respect to any other defendant on trial.

## MULTIPLE DEFENDANTS

The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. Your decision as to one defendant should not control your decision as to the other defendant.

## SPECIFIC INSTRUCTIONS WITH RESPECT TO SELECTION PHASE

You have found the defendant guilty of Murder in the First Degree and eligible for the death penalty. You are now called upon to decide the issue of punishment, that is, whether the defendant should be sentenced to death or life in prison without the possibility of release.

The deliberative process that you must follow in this phase of the trial is as follows. First, you must consider whether the government has proved beyond a reasonable doubt, and to your unanimous satisfaction, the non-statutory aggravating factors that have been alleged. "Aggravate" means to make worse. An "aggravating factor" is a fact or circumstance that would tend to support imposition of the death penalty.

The non-statutory aggravating factors the government has alleged as to Defendant Christopher Cramer are:

1. The defendant poses a continuing and serious threat to the lives and safety of others because it is likely that he will commit criminal acts of violence in the future; and

2. The defendant caused loss, injury, and harm to Leo Johns and Leo Johns's family.

You must consider each of the non-statutory aggravating factors, and the evidence pertaining to each of those factors, separately. You may consider all the evidence you have heard at all phases of the trial in making your decision as to whether the government has proved the existence of the non-statutory aggravating factors beyond a reasonable doubt. Your findings as

11

to the non-statutory aggravating factors alleged by the government in this phase of the trial must be unanimous. In other words, if you are not unanimous in finding a non-statutory aggravating factor, you may not consider that factor in any further deliberations.

Second, you must consider whether any mitigating factors offered by the defendant have been established by a preponderance of the evidence. A "mitigating factor" is any aspect of a defendant's background, record, or character, or any other circumstance of the offense, that mitigates against imposition of the death penalty. A "preponderance of the evidence" means evidence that persuades you that the defendant's claims are more likely true than not true.

The defendant has argued and submitted evidence relevant to certain mitigating factors. You may also consider any other factor about the defendant's background, record, or character or the circumstances of the offense, whether or not argued by defense counsel, that you believe to be mitigating, if such a factor has been established by a preponderance of the evidence. Any member of the jury who finds the existence of a mitigating factor should consider such a factor regardless of the number of jurors who concur that the factor has been established. Unanimity is not required.

Third, you must decide whether the statutory aggravating factors, which you determined were proved in the eligibility phase, and the non-statutory aggravating factors, if any, which you unanimously find have been proven beyond a reasonable doubt in this selection phase, sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factors alone are sufficient to justify a sentence of death.

12

As to Defendant Christopher Cramer, you determined the following three (3) statutory aggravating factors were proved in the eligibility phase:

1.    The defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than one (1) year, involving the use or attempted or threatened use of a firearm against another person;

2.    The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, Leo Johns; and

3.    The defendant committed the offense after substantial planning and premeditation to cause the death of a person.

If you do not find that the government has proved the existence of a non-statutory aggravating factor alleged in the selection phase beyond a reasonable doubt, you must then decide whether the statutory aggravating factors set forth above sufficiently outweigh all mitigating factors found to exist.

Based upon your individual consideration of all of the aggravating factors you have found unanimously, and all of the mitigating factors you have found individually, the jury must decide whether it unanimously finds that justice requires the imposition of the death penalty. Understand that each of you may not be weighing the same mitigating factors. How much weight you give to any aggravating or mitigating factor is in the discretion of each juror.

If you find no mitigating factors, you must still determine whether the aggravating factors standing alone justify a sentence of death.

Any one aggravating factor proved by the government, if sufficiently serious in your mind, may outweigh several mitigating factors. Thus, for example, even if you were to find the government did not prove the non-statutory aggravating factors in the selection phase, you would still have to weigh the statutory aggravating factors found in the eligibility phase against the

13

mitigating factors. A single mitigating factor may outweigh several aggravating factors, and any juror who finds a single mitigating factor would still have to weigh that mitigating factor against the aggravating factors.

In order to impose a sentence of death or life imprisonment without the possibility of release, all twelve jurors must unanimously agree that a sentence of death or a sentence of life imprisonment without the possibility of release is the appropriate sentence. Only if you are unanimously persuaded that the aggravating factors sufficiently outweigh the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factors alone are sufficient to justify a sentence of death, may you then return a verdict in favor of death.

Although in the eligibility phase you unanimously found at least one of the threshold intent factors proved beyond a reasonable doubt, I instruct you now that the threshold intent factors shall not be considered when weighing the aggravating and mitigating factors.

Passion, prejudice, and any arbitrary considerations have no role to play in your efforts to reach a just result in this case. In carefully weighing the various factors at issue, you are called upon to make a unique, individualized judgment about the appropriateness of imposing the death penalty on the defendant. This is not a mechanical process. Neither is it determined by raw numbers. You should not simply count factors. Instead, you must consider the factors qualitatively.

In short, what is called for in weighing the various factors is not mathematical skill, but rather your careful, considered, and mature judgment. You are called upon to make a reasoned judgment, based upon all the evidence before you, as to whether the death penalty is the

14

appropriate punishment for the defendant, or whether the defendant should be sentenced to life imprisonment without the possibility of release. Please understand, however, that a sentence of death is never mandatory under the law. Thus, even if you find that the aggravating factors outweigh any mitigating factor or factors, or in the absence of any mitigating factors, you may still find that the aggravating factors alone are not sufficient to justify a sentence of death and return a verdict in favor of life imprisonment without the possibility of release.

If, after weighing the aggravating and mitigating factors, you unanimously recommend that a sentence of death shall be imposed, then the Court is required to sentence the defendant to death. If you unanimously recommend that a sentence of life imprisonment without the possibility of release shall be imposed, then the Court is required to sentence the defendant to life imprisonment without the possibility of release. Life imprisonment means that the defendant will, in fact, serve the remainder of his natural life in prison. He will never be paroled. Parole has been abolished under federal law.

## NON-STATUTORY AGGRAVATING FACTORS

The government has alleged the following two (2) non-statutory aggravating factors as to Defendant Christopher Cramer:

1. Christopher Cramer is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, as evidenced by, at least, one or more of the following:

   a. Christopher Cramer has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including, at least, the crimes alleged against defendant in the Superseding Indictment and the crimes of which the defendant was previously convicted, including his 2003 District of Utah conviction for carrying or using a firearm in relation to a crime of violence; his conviction on or about November 5, 2010, in the Eastern District of Kentucky for possession of a homemade knife in a correctional facility; and his

conviction on or about April 6, 2012, in the Central District of California for i) assault with intent to commit murder, ii) assault with intent to do bodily harm, and iii) assault causing bodily injury;

b.    Christopher Cramer committed repeated acts of institutional misconduct while in the custody of various state and local correctional or detention agencies, the United States Bureau of Prisons, or United States Marshal's Service;

c.    Christopher Cramer has demonstrated a lack of remorse for the capital offense in this case, as indicated by the defendant's statements and actions during the course of and following the offense alleged in the Superseding Indictment;

d.    Christopher Cramer has demonstrated a low potential for rehabilitation as evidenced by his record of institutional misconduct and his longstanding involvement in criminal activities, including, at least, his 2003 District of Utah conviction for carrying or using a firearm in relation to a crime of violence; his conviction on or about November 5, 2010, in the Eastern District of Kentucky of possession of a home-made knife in a correctional facility; and his conviction on or about April 6, 2012, in the Central District of California for i) assault with intent to commit murder; ii) assault with intent to do bodily harm and iii) assault causing bodily injury, leading up to the capital offense charged in the Superseding Indictment; and/or

e.    Christopher Cramer has demonstrated an allegiance to and active membership in gangs in prisons, such organizations falling within the definition of criminal street gangs set forth in 18 U.S.C. § 521(a), which defines a criminal street gang as an ongoing group, club, organization, or association of 5 or more persons that has as one of its primary purposes the commission of federal felonies involving controlled substances and/or federal felony crimes of violence involving the use or attempted use of physical force against the person of another and/or conspiracies to commit those crimes, and whose members within the past 5 years have engaged in a continuing series of such offenses, which affects interstate or foreign commerce.

16

To establish the existence of this non-statutory aggravating factor, the government must prove beyond a reasonable doubt that the defendant represents a continuing danger to the lives and safety of others.

    2.    As reflected by the victim's personal characteristics as a human being and the impact of the offenses on the victim and the victim's family, Christopher Cramer caused loss, injury, and harm to the victim and the victim's family including, but not limited to, the fact that the victim's family suffered severe and irreparable harm.

To establish the existence of this non-statutory aggravating factor, the government must prove beyond a reasonable doubt that the defendant caused loss, injury, and harm to Leo Johns and Leo Johns's family.

Because these are the only non-statutory aggravating factors alleged by the government, they are—by law—the only non-statutory aggravating factors you may consider, in addition to the statutory aggravating factors set forth on Page 13 of these instructions that you found were established in phase two of the trial, in arriving at your decision.

## MITIGATING FACTORS

It is the defendant's burden to establish mitigating factors by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt, the standard to which the government must be held in proving aggravating factors.

Preponderance of the evidence means that evidence which, when considered as a whole, leads you to believe that the defendant's claims are more likely true than not.

Mitigating factors differ from aggravating factors in another important way. Unlike aggravating factors, which the jury must unanimously agree exist, any member of the jury who finds the existence of a mitigating factor by a preponderance of the evidence must consider such

17

factor established, regardless of the number of other jurors who concur that the factor has been established.

Unlike aggravating factors, you should consider any other factor, whether specifically argued by defense counsel or not, which you believe to be mitigating, if such a factor, in your judgment, has been established by a preponderance of the evidence. In short, you have greater discretion in considering mitigating factors than you have in considering aggravating factors.

Defendant Christopher Cramer has submitted the following proposed mitigating factors with respect to his background, record, or character, or any other circumstance of the offense that mitigate against the imposition of the death penalty:

1. Christopher Cramer never had a stable home; rather, he was moved to numerous residences in his childhood.

2. Christopher Cramer never had a relationship with his biological father.

3. Christopher Cramer's mother abused alcohol and illicit substances during her pregnancy with him.

4. Christopher Cramer's mother told him he was born a crack baby.

5. Christopher Cramer was raised in a dysfunctional family.

6. Christopher Cramer was raised in a family of violence.

7. Christopher Cramer was raised in a family of drug abuse and sexual abuse.

8. Christopher Cramer was raised in a noxious environment.

9. Christopher Cramer was raised in a toxic environment.

10. Christopher Cramer's mother abandoned Christopher Cramer and his siblings repeatedly.

11. Christopher Cramer's mother meted out abusive punishments to him and his siblings.

12.    Christopher Cramer's mother whipped her children with paddles, extension cords, fishing rods, and belts.

13.    Christopher Cramer was the sibling who bore the brunt of the abuse in the home as a child.

14.    There was widespread criminal conduct within Christopher Cramer's family.

15.    Christopher Cramer's mother engaged in prostitution around him while he was a child.

16.    Christopher Cramer's mother engaged in drug abuse around him while he was a child.

17.    Christopher Cramer witnessed men assault his mother on multiple occasions.

18.    Christopher Cramer observed his mother and her husband Terry Keys fighting and beating each other weekly.

19.    Christopher Cramer observed his mother stab or slice her husband Terry Keys with a knife.

20.    At a young age of eleven or twelve, Christopher Cramer pulled a knife on Terry Keys to try and stop him from assaulting Christopher Cramer's mother.

21.    At the time he was trying to protect his mother, Christopher Cramer was more fearful for his mother than himself.

22.    When he was a young teenager, Christopher Cramer defended his mother from an assault by striking the man who had beaten her severely with a rebar.

23.    Christopher Cramer felt like he could protect his mother from assaults after striking the man who had severely beaten her.

24.    When Christopher Cramer was fifteen years old, he felt like a grown man because he could protect his mother.

25.    When Christopher Cramer was fifteen years old, he felt like he could take care of himself.

19

26.    Christopher Cramer's mother owed drug debts and made him provide protection for her, including arming him with a weapon to protect her.

27.    Christopher Cramer thought protecting his mother from drug dealers was normal because it was all he knew.

28.    Christopher Cramer lived in seedy hotels, apartments, and vehicles in poverty as a child.

29.    Christopher Cramer had educational deficits, including being diagnosed with a learning disorder as a child.

30.    Christopher Cramer was placed in special education as a child.

31.    Christopher Cramer dropped out of school at the conclusion of the ninth grade.

32.    Christopher Cramer's intellectual ability is in the lower 20% of the population.

33.    While living in California as a teenager, Christopher Cramer was exposed to gangs.

34.    While living in California as a teenager, Christopher Cramer was exposed to fights.

35.    While living in California as a teenager, Christopher Cramer was exposed to pimps beating their prostitutes.

36.    While living in California as a teenager, Christopher Cramer was exposed to finding a dead body in an alleyway.

37.    Christopher Cramer went to live with Lorenzo Hubbard because he wanted a more stable home.

38.    Christopher Cramer viewed Lorenzo Hubbard as his father.

39.    When Lorenzo Hubbard passed away, it had a great detrimental effect on him.

40.    Lorenzo Hubbard was a bad role model for Christopher Cramer.

41.    Lorenzo Hubbard taught Christopher Cramer to use drugs at an early age.

42.    Lorenzo Hubbard used Christopher Cramer as a "door man" for his drug dealing when Christopher Cramer was a child.

43.    Christopher Cramer knew Lorenzo Hubbard was a pimp, running prostitutes.

44.    Lorenzo Hubbard was the pimp for Christopher Cramer's mother, Darla Dillon.

45.    Christopher Cramer looked up to his older brother, Ronald McElroy.

46.    Ronald McElroy was not a positive role model for Christopher Cramer because of Ronald McElroy's drug dealing and criminal activities, which he modeled for Christopher Cramer.

47.    Ronald McElroy used Christopher Cramer as a "door man" for his drug dealing when Christopher Cramer was a child.

48.    Christopher Cramer's mother failed to protect him from assaults by the men in her life.

49.    The only stable role model in Christopher Cramer's life was his grandmother, Joella Hubbard.

50.    Christopher Cramer loved his grandmother deeply.

51.    When Christopher Cramer's grandmother passed away, it had a great detrimental effect on him.

52.    Christopher Cramer and his siblings thought the dysfunctional lifestyle they lived was a normal life, because it was the only life they knew.

53.    The environment in which Christopher Cramer was raised contributed to his behavior as an adult.

54.    If Christopher Cramer had been raised in a normally functioning family, he likely would not be in the situation he is facing today.

55.    Christopher Cramer developed a marijuana dependency as a child.

56.    Christopher Cramer developed a methamphetamine addiction as a child.

57.    Christopher Cramer learned to cope with life by the violence he experienced as a child.

58.  Christopher Cramer learned to cope in prison by violence because that is how he was taught to cope with his dysfunctional life.

59.  Christopher Cramer suffers from a mental illness, Antisocial Personality Disorder.

60.  The mental illness from which Christopher Cramer suffers, Antisocial Personality Disorder, is not a result of his choice.

61.  Christopher Cramer suffers from a mental illness, Attention Deficit Hyperactivity Disorder ("ADHD").

62.  The mental illness from which Christopher Cramer suffers, ADHD, is not a result of his choice.

63.  The psychiatric diagnoses for Christopher Cramer include specific trauma and related stress disorder with a history of complex trauma.

64.  Disorganized attachment and polytrauma had a significant effect on Christopher Cramer.

65.  In his upbringing, Christopher Cramer had a number of individual risk factors as identified in Department of Justice Office of Juvenile Justice and Delinquency Prevention publications.

66.  Christopher Cramer's evaluation under the Adverse Childhood Experiences study ("ACE") indicates that he suffered eleven risk factors.

67.  Christopher Cramer's evaluation under the ACE indicates that he suffered cumulative effects from the multiple risk factors he experienced.

68.  Christopher Cramer's cumulative ACE score results in a negative relationship to numerous health, social, and behavioral issues throughout his lifespan.

69.  The neurodevelopmental condition of ADHD, the effects of concussions, and early trauma placed Christopher Cramer's brain at risk for impaired development as well as deficits in emotional, cognitive, behavioral, and psychological functioning.

70.  The combination of mental illnesses from which Christopher Cramer suffers contributed to his current situation.

22

71.    Based on Christopher Cramer's upbringing, he had no chance of success in life.

72.    Christopher Cramer assumed the parenting role and responsibility of tending to the needs of siblings while he was a child, at an age when he himself needed parenting and someone to tend to his needs.

73.    Christopher Cramer stole food as a child to feed his siblings.

74.    Christopher Cramer assumed the role of protector in his family.

75.    Christopher Cramer provided emotional support to his sister Chaminque Porter when they were children.

76.    Christopher Cramer saved Chaminque Porter from being abducted when they were children.

77.    Christopher Cramer continues to provide emotional support to Chaminque Porter.

78.    Christopher Cramer provided emotional support to Angel Anderson when they were children.

79.    Christopher Cramer continues to provide emotional support to Angel Anderson.

80.    Christopher Cramer provides emotional support to Angel Anderson's daughter, Kimberly Anderson.

81.    Christopher Cramer was a good brother to Diamante Hubbard when they were children.

82.    Diamante Hubbard still looks up to Christopher Cramer as his big brother.

83.    Christopher Cramer was a good brother to Lorenzo Hubbard Davis when they were children.

84.    Lorenzo Hubbard Davis still looks up to Christopher Cramer as his big brother.

85.    Hortensia White loved Christopher Cramer as if he was her own son when he was a child.

86.    Christopher Cramer was a wonderful child.

87. Christopher Cramer was loved by everyone around him as a child.

88. Hortensia White still loves Christopher Cramer.

89. Christopher Cramer loves his family deeply.

90. Christopher Cramer's family loves him deeply.

91. Christopher Cramer has redeeming qualities.

92. Christopher Cramer tried to better himself by working at Job Corps.

93. Christopher Cramer tried to better himself by applying to the military.

94. Christopher Cramer never treated his black family members with any racial discrimination.

95. Christopher Cramer is not a racist.

96. Christopher Cramer apologized to family members for the hate displayed by his tattoos.

97. According to family members, Christopher Cramer has tattoos as a facade.

98. According to family members, Christopher Cramer's tattoos are a smokescreen.

99. Christopher Cramer became an inmate in the Federal Bureau of Prisons ("BOP") at a young age.

100. Christopher Cramer expressed remorse for causing emotional trauma to the bank employees in his robbery that sent him to prison at a young age.

101. Life for inmates in the BOP is characterized as a world where up is down, down is up, right is wrong, and wrong is right, according to the government's witness, BOP SIS Officer Nylen.

102. Inmates in the BOP settle disputes among themselves.

103. Christopher Cramer tried to better himself in prison by getting his GED.

104. Christopher Cramer associated with African-Americans when he entered prison.

24

105.    Christopher Cramer was assaulted by a Hispanic gang when he entered prison.

106.    When Christopher Cramer was assaulted in prison, his African-American friends did not come to his aid.

107.    When Christopher Cramer was assaulted in prison, a white supremacy group came to his aid.

108.    Christopher Cramer was himself stabbed while in prison.

109.    Christopher Cramer joined the Soldiers of Aryan Culture ("SAC") in need of protection.

110.    Christopher Cramer joined SAC in need of a family in prison.

111.    Christopher Cramer is opposed to the use of alcohol and drugs in his prison gang.

112.    Inmate Leo Johns was disrespectful to Christopher Cramer in violation of gang rules.

113.    Inmate Leo Johns provoked the offense on June 9, 2014, by referring to SAC as "Fuck them Dudes."

114.    Gang rules required Christopher Cramer to take action against inmate Leo Johns.

115.    Christopher Cramer had to act against inmate Leo Johns to avoid placing himself in danger.

116.    Christopher Cramer did not harm any correctional officers or staff in the commission of the offense.

117.    Christopher Cramer has committed no violent act in prison since the death of Leo Johns on June 9, 2014.

118.    Because of his federal conviction for the murder of inmate Leo Johns, Christopher Cramer will never be eligible for release.

119.    Christopher Cramer has never previously been charged with or convicted of the offense of murder.

120. There are alternatives in the BOP to protect inmates and staff other than executing Christopher Cramer.

121. In 15 years of incarceration, Christopher Cramer has never assaulted a prison staff member or correctional officer.

122. Since the offense, Christopher Cramer has been housed in Medium and Low Units in the BOP.

123. When housed in the Special Housing Units rather than being in general population, BOP psychologists have determined Christopher Cramer's threat level to others to be Low.

124. After the offense, the BOP approved Christopher Cramer for transfer to the Administrative-Maximum United States Penitentiary ("ADX").

125. Christopher Cramer adapted well to incarceration while housed at ADX.

126. Christopher Cramer is happy at ADX.

127. The BOP has the discretion to keep Christopher Cramer at ADX for however long is necessary.

128. The BOP is capable of fashioning conditions of confinement that will control Christopher Cramer's activities until his death in prison.

129. ADX is the most secure prison in the United States.

130. At ADX, every inmate lives in a cell alone.

131. At ADX, staff apply handcuffs and leg shackles without entering Christopher Cramer's cell.

132. At ADX, Christopher Cramer will only leave his cell after a shakedown and being searched with a metal detector.

133. At ADX, Christopher Cramer will never be moved from his cell unless he is wearing handcuffs connected to a chain around his waist while two correctional officers armed with tactical batons and pepper spray escort him.

134. At ADX, Christopher Cramer is only moved from his cellblock if he is wearing handcuffs connected to a chain around his waist and leg irons while

three correctional officers armed with tactical batons and pepper spray escort him.

135. At ADX, Christopher Cramer is allowed to recreate only one hour per day alone outside of his cell.

136. At ADX Control Unit and ADX General Population, Christopher Cramer can have no physical contact with any other inmate.

137. At ADX, Christopher Cramer is extremely limited in his ability to communicate with any person inside or outside the institution.

138. Staff at ADX have the ability to eliminate completely any communication by Christopher Cramer with any other person, inside or outside of the institution, if they deem it necessary.

139. The Control Unit at ADX is an even more secure portion of the ADX institution.

140. The conditions of confinement to which Christopher Cramer will be subjected will be severe punishment for the rest of his life.

141. Christopher Cramer has already been sentenced to the Control Unit for a 74-month term.

142. If Christopher Cramer commits any infraction, no matter how small, he loses credit on his sentence to the Control Unit for that month.

143. Even if Christopher Cramer commits no infraction, he can be kept in the Control Unit at the discretion of ADX officials.

144. There are inmates in the ADX who have been incarcerated there for 24 years since it opened, and who were in lockdown before being transferred there.

145. Even if Christopher Cramer commits no infractions and has exemplary behavior at ADX, the officials at ADX have the discretion to keep him incarcerated there.

146. The "kite" written by Christopher Cramer mentioning being "back on a yard" will prevent him from ever being released from ADX.

147. Christopher Cramer's gang status in SAC will prevent him from being released from ADX.

148.   Research shows that the longer a person is in prison, the less likely it is that he will engage in misconduct.

149.   Research shows that the longer a person is in a gang, the less likely that he will engage in misconduct.

150.   Research shows that as an inmate ages, he tends to settle down and take fewer risks.

151.   Inmates with sentences of life without parole have a lower incidence of violence than inmates with shorter sentences.

152.   The BOP has the capability to house Christopher Cramer in ADX and ensure the safety of him, other inmates, and staff.

In the appropriate section of the Verdict Form prepared for this phase of the trial, you are asked to identify any additional mitigating factors, outside of those proposed by the defendant. You may, but are not required to, write in any additional mitigating factors found by a preponderance of the evidence by any juror. If you think that there is some other mitigating factor present as to the defendant, but you simply are not able to articulate it with any specificity, you may still fully consider that factor without recording it on the Verdict Form.

### DUTY TO DELIBERATE—VERDICT FORM

The verdict must represent the considered judgment of each juror. It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors. During your deliberations, do not hesitate to reexamine your own views and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, BlackBerry, tablet, or computer; the Internet, any Internet service, or any text or instant messaging service; or any Internet chat room, blog, or website such as Facebook, MySpace, LinkedIn, Google+, Twitter, or YouTube to communicate to anyone any information about this case or to conduct any research about this case until you are discharged from jury service.

Remember at all times, you are judges—judges of the facts. Your duty is to decide whether a sentence of death or life imprisonment without the possibility of release is the appropriate sentence in this case.

In considering whether a death sentence is justified, you must not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim in this case. These facts are completely irrelevant to the important issues you must consider. You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of either the defendant or the victim might have been. To emphasize the importance of this

consideration, attached to the Verdict Form is a certificate that must be signed by each juror attesting that considerations of race, color, religious beliefs, national origin, or sex of the defendant or the victim were not involved in reaching your individual decision.

As you retire to begin your deliberations, you will be provided with a Verdict Form. Special Finding I of the Verdict Form contains space to record your written findings on the non-statutory aggravating factors.

Special Finding II of the Verdict Form contains space to record written findings on the mitigating factors. Because any one juror may find the existence of a mitigating factor, Special Finding II also provides space for you to record how many jurors have found any particular mitigating factor. Additionally, Special Finding II provides extra space for you to record additional mitigating factors, which were not specifically listed or argued by counsel, but which one or more jurors found to be proven by a preponderance of the evidence.

Special Finding III of the Verdict Form is where you should record your ultimate finding as to whether the defendant should be sentenced to death or life imprisonment without the possibility of release.

Special Finding IV contains the Jury Certification which must be signed by each juror and dated by the jury foreperson.

If you need to communicate with me during your deliberations, the foreperson should write the message and give it to the court security officer. I will either reply in writing or bring you back into the courtroom to respond to your inquiry.

Bear in mind that you are never to reveal to any person, not even to the Court, how the

jury stands, numerically or otherwise, until after you have reached a unanimous verdict.


SIGNED at Beaumont, Texas, this _iℓℓ_ day of June, 2018.




_____
Marcia A. Crone
United States District Judge

31